Argued and submitted October 27, 2011, affirmed March 14, 2012

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TRIDENT SEAFOODS CORPORATION,
*Defendant-Appellant.*

Lincoln County Circuit Court
062578, 062614, 062615;
A143431 (Control), A143432, A143433

274 P3d 218

Guy B. Greco argued the cause and filed the briefs for appellant.

Michael A. Casper, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

SCHUMAN, P. J.

## SCHUMAN, P. J.

Defendant Trident Seafoods Corporation is a wholesale fish processer in Newport that purchases and processes the catch from ocean-going fishing vessels. Ordinarily, defendant's ability to possess and process fish is limited to certain species and quantities. In 2005, however, defendant entered into an agreement with the state that allowed it to possess and process "by-catch," that is, otherwise prohibited amounts and species of fish that were inadvertently caught in vessels' nets set for a particular species: hake, also known as pacific whiting. According to the state, the agreement required defendant to pay the state the fair market value of the by-catch. Defendant failed to pay for the months of June, July, and August 2005, and the state cited defendant for violation of a fish and game regulation, a Class A misdemeanor under ORS 496.992. At trial, defendant filed a motion for a judgment of acquittal, arguing that, first, it was exempt from the regulation that required payment to the state for by-catch; second, the agreement required payment from the owners of fishing vessels and not processers; and third, even if the regulation applied and required payment of fair market value by processers, the by-catch had a fair market value of zero. The court denied defendant's motion and ultimately entered three judgments of conviction, one for each month during which defendant failed to pay. Defendant seeks reversal of the convictions, assigning error to the denial of its motion for a judgment of acquittal. We affirm.

The facts are largely undisputed, and most of the issues are legal. To the extent that the evidence presents factual disputes, we state the facts in the light most favorable to the state. *State v. Hall*, 327 Or 568, 570, 966 P2d 208 (1998). Fishing vessels and processors are generally subject to state and federal regulation as to the types and quantities of fish that may be caught and processed during a given period. In the summer of 2005, defendant entered into an agreement with the Oregon Department of Fish and Wildlife (ODFW) to participate in a federally created hake fishery program known as the Shoreside Hake Observation Program (SHOP), developed by the National Marine Fishery Service (NMFS). Under the program, selected fishing vessels received

Exempted Fishing Permits (EFP) and were permitted to keep all the fish caught in their trawl nets, including otherwise protected species as well as "overage," *i.e.*, nonprotected "groundfish" species other than hake that were landed in excess of otherwise applicable legal limits. The EFP fishing vessels were required to deliver their unsorted catch only to designated EFP processors, such as defendant, that were participating in the program. The processors then had to keep and report information concerning the catch. The state arranged to collect and distribute all prohibited species of fish for charitable use, but the processors were permitted to sell by-catch overages. The dispute in this case concerns whether and to what extent processors were required to pay the state for by-catch overages.

In June 2005, defendant signed an "Agreement and Designation of Fish Processor Cooperating in the Shoreside Hake Observation Program" (the agreement) with ODFW. Under the terms of the agreement, defendant was designated as a processing plant authorized to possess and process by-catch. In exchange, defendant agreed to document all of the fish it received from participating vessels and to provide that information within six hours on "fish tickets" to ODFW and to each EFP vessel.

The agreement provided that processors had to note on the fish tickets "any Overages in groundfish," and that "[a] check will be made out to the state [or] NMFS within five working days based on the excess pounds and Fair Market Value of fish." The agreement defined "fair market value" as the market price at the time and place where the fish were landed, unless that could not be determined, in which case the fair market value would, by default, be the values set out in a state rule, OAR 635-006-0232.[1] The agreement provided

---

[1] The agreement defines fair market value as "the current price paid by processors for a given species, as defined by OAR 635-006-0233." OAR 635-006-0233 provides that, "[f]or purposes of legally landed overages where proceeds are to be remitted to the state, payment shall be at fair market value as defined in OAR 635-006-0001." OAR 635-006-0001(5) provides that fair market value "shall be based on the market price of food fish or shellfish at the same time and place that the fish are landed, or the price established in OAR 635-006-0232 when the market price cannot be determined." OAR 635-006-0232, finally, establishes the specific default market value for dozens of fish species.

that "[v]essel captains and owners are responsible for ensuring overage payments are made to the state of landing or the NMFS."

The agreement stated in two separate sections that a failure to comply with any of the terms of the agreement could result in its termination. At Section A. 4., the agreement provided that "[f]ailure of Processor to comply with the terms and conditions of this Agreement and Designation are grounds for the state, acting through [ODFW], to revoke this designation, 24 hours after notification is delivered to Processor by the state." At Section C. 4., the agreement provided:

> "Failure to comply with the terms of this Agreement and Designation, *including a failure to transmit information, remit fair-market value for overages in a timely manner,* or exclude an EFP vessel from landings by the time required during the timeout period may result in termination of this Agreement and Designation. * * * [T]he state may revoke this Agreement and Designation 24 hours after delivering written notice to Processor, setting forth the grounds for the revocation. Termination of this Agreement and Designation removes Processor from the designated processor list and eliminates the Processor's ability to receive unsorted hake. All federal and state regulations then apply to the Processor's operations."

(Emphasis added.)

In June 2005, officials from ODFW and the Oregon State Police met with representatives of defendant and other participating processors to discuss the requirements of the SHOP program. State Police Sergeant Michael Thompson told the processors that they would be responsible for remitting the fair market value for fish overages to the state. The general manager for defendant's Newport plant, William Olivera, expressed concern that his plant lacked the ability to process fish other than hake, and objected to remitting payment to the state for groundfish species that it could not process and sell. Thompson suggested that defendant try to sell the nonhake species to other processors that were equipped to process those species. Olivera told Thompson that defendant was unwilling to do so. Thompson then told Olivera that defendant was free to do as it wished, but that it would be

required to pay fair market value of the legal fish overages to the state.

During the summer of 2005, Thompson visited defendant's plant once each week to inspect fish. Thompson noted that the by-catch received by defendant included thousands of pounds of by-catch overage consisting of widow rockfish, yellowtail rockfish, sable fish, ling cod and other federally managed species, and Thompson believed that the by-catch was in good condition and marketable. Defendant's plant, as noted, could process only hake and lacked the capacity to process other by-catch overage. Thus, for species that it was unable to process or sell, defendant ground the fish into fish meal. Defendant submitted hundreds of fish tickets to the state reporting a fair market value of those by-catch species as zero and did not remit any money for the by-catch overage.

In December 2005, state police investigated defendant for failure to pay fair market value for the by-catch overages. One of defendant's employees calculated that, based on trip tickets, the amount owed to the state for the periods of June, July, and August 2005 was approximately $20,000. Subsequently, however, defendant declined to remit that amount, explaining that, because it had been unable to process and sell the by-catch, the by-catch had no value.

OAR 635-006-0233 states, simply, that "[f]or purposes of legally landed overages where proceeds are to be remitted to the state, payment shall be at fair market value as defined in OAR 635-006-0001." Violation of this rule becomes the basis of a criminal sanction under ORS 496.992(1), which states:

> "Except as otherwise provided by this section or other law, a violation of any provision of the wildlife laws, or any rule adopted pursuant to the wildlife laws, is a Class A misdemeanor if the offense is committed with a culpable mental state."

Based on defendant's failure to pay fair market value for by-catch overages as required by the processing agreement and OAR 635-006-0233, the state cited defendant under ORS 496.992(1).

Defendant's case was tried to the court. At the close of the state's case, defendant moved for a judgment of acquittal on three grounds: (1) the agreement renders defendant exempt from the requirement in OAR 635-006-0233 to pay fair market value for the by-catch; (2) under the agreement, the vessel owner, not the processor, is responsible for paying fair market value to the state; and (3) assuming that defendant had a duty to pay, the state failed to establish a failure to pay fair market value of the by-catch overage.

In a written opinion, the trial court rejected each of defendant's arguments. The court found defendant guilty and entered three judgments of conviction, one for each month during which no payment was made, and assessed a fine of $2,000 for each. The court also imposed restitution to ODFW in the amount of $14,297.54. Defendant now appeals.

Defendant first contends that the agreement exempted it from compliance with state and federal wildlife laws and regulations, including the requirement in OAR 635-006-0233 that defendant pay fair market value for by-catch overages. According to defendant, ODFW has authority to suspend the application of regulations to a particular fishery, *see, e.g.*, ORS 506.119; ORS 506.129, and the state did just that in this case by entering into the agreement with defendant. In particular, defendant points to three provisions of the agreement stating that, if a processor is not part of the SHOP program, state and federal regulations apply to it. From these statements, defendant infers that, because it *is* part of the SHOP program, regulations do *not* apply. That argument is fallacious. It would be valid only if the universe of regulations that do apply to nonparticipants is the same universe of regulations that do not apply to participants.[2] That is not the case; *all* regulations apply to nonparticipants, while only regulations of what species and quantities can be

---

[2] As a matter of formal logic: The fact that the truth value of the statement "If p, then q" is true does not necessarily imply that the inverse of the statement, "If not p, then not q" is also true. Thus: The statement, "If a figure is a triangle, it is a polygon," is true, but the statement, "If a figure is not a triangle, it is not a polygon" is false; a square is not a triangle, but it is a polygon. On the other hand, the statement, "If a number is divisible by 2, it is even," is true, and the statement, "If a number is not divisible by 2, it is not even" is also true. In the latter example, the truth value of the statement and its inverse are the same because the universe of numbers divisible by 2 is the same as the universe of even numbers.

processed are suspended for participants. Nothing in the agreement purports to suspend any obligation to pay the state for by-catch. Put another way (to quote the state):

> "The agreement, while in force, suspended *some* legal requirements—namely, state and federal prohibitions on the possession and sale of fish beyond legal limits. Termination of the agreement restored the applicability of those limits, thus restoring the applicability of 'all state and federal regulations.' But it does not follow that the agreement suspended *all* legal requirements."

(Emphasis in original.)

Defendant also argues, however, that, if the agreement does impose an obligation to pay the state for by-catch overage, the obligation falls on the owners of the vessels and not on the processors. Defendant cites the provision of the agreement that states, "Vessel captains and owners are responsible for ensuring overage payments are made to the state of landing or the NMFS." In defendant's view, that provision unambiguously means that vessel owners must *make* the payments to the state or to NMFS. Defendant's interpretation is certainly plausible if one reads the provision in isolation from the rest of the document. However, viewing the provision in the context of the document as a whole, as we must, *see Yogman v. Parrott*, 325 Or 358, 361, 937 P2d 1019 (1997) (explaining that interpretation of a contract involves examining the text of the disputed provision in the context of the document as a whole), it becomes clear that it is the processor who must make the payments; the vessel captain is merely charged with ensuring that the processor makes the payments.

Paragraph D. 1. of the section of the agreement entitled "Receiving and Processing of Targeted Hake Trips," requires the *processor* to note overages on an overage fish ticket. The sentence immediately following states that, within five working days, "[a] check will be made out to the state [or] NMFS * * * based thus on the excess pounds and the Fair Market Value of the fish." The implicit requirement is that it is the *processor* who will make out the check for the fair market value of the fish, based on the overage stated on the fish ticket.

We reach that conclusion for two reasons: (1) Logically, in the structure of the paragraph, the requirement appears to be directed to the processor, who is responsible for noting overages on fish tickets. The requirement to pay the state follows immediately after the requirement placed on the processor to note overages, and references back to the latter requirement—"based thus on the excess pounds." (2) The agreement is between the state and processor, not the state and the vessel captain or owner. It would make no sense to impose, in a paragraph regarding "Receiving and Processing," an obligation on vessel captains—who do not receive or process fish, who are not parties to the agreement, and who would be beyond the enforcement ability of processors.

Our conclusion concerning the meaning of paragraph D. 1. is reinforced by another paragraph of the agreement. At paragraph C. 4., the agreement lists three grounds for termination of the agreement: "a failure to transmit information, remit fair-market value for overages in a timely manner, or exclude an EFP vessel from landings by the time required during the timeout period[.]" Certainly, the "failure to transmit" and "failure to exclude" grounds can apply only to a processor, not a vessel captain. It is logical that the "failure to remit" ground would also be directed to the processor. Further, once again we note that, because the agreement is between the state and the processor, it would make no sense to list as a ground for termination the failure to "remit fair-market value for overages" unless the remitting of overages is a responsibility of the processor.[3]

Thus, despite the possible ambiguity created by the agreement's statement that the vessel owner is responsible "for ensuring overage payments are made," and the agreement's use of the passive voice in requiring that "a check will be made out," we conclude that the only plausible reading of the agreement is that the processor must pay for the overage.

---

[3] Defendant does not challenge the trial court's findings that (1) defendant understood at the time that it entered into the agreement that it would be required to make the payments to the state and (2) that defendant remitted some by-catch overage payments to the state, when it could sell the by-catch; it objected to making payment only when it could not sell the by-catch. Thus, to the extent that the agreement was interpreted to be ambiguous, that extrinsic evidence would support our interpretation.

We therefore reject defendant's contention that the trial court erred in denying its motion for judgment of acquittal on the ground that it had no obligation under the agreement to remit payment.

Defendant's final contention is that the state failed to establish that defendant did not remit the fair market value of the by-catch overages. Defendant asserted that, because it did not process the nonhake fish, the fair market value of the overage was zero. However, the state presented evidence that defendant considered selling the fish that it lacked the ability to process, but that it did not, because it was unable to do so for a profit. The state also presented a list of all of the fish tickets defendant filed in the summer of 2005, which included the weights of the various species that defendant received. OAR 635-006-0232 establishes a default market value for the various fish species. Finally, defendant's employee reviewed the fish tickets and estimated that defendant owed approximately $20,000 in overages. We conclude that the evidence was sufficient to permit the trial court to find that the by-catch overages had a fair market value and that defendant failed to remit that amount to the state.[4] Affirmed.

---

[4] Defendant does not question the imposition of three convictions, one for each month, and we therefore do not address that question.